IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DIANE G. SHORT, SAMIRA PARDANANI, JUDITH DAVIAU, and JOSEPH BARBOZA, Individually and as representatives of a class of participants and beneficiaries in and on behalf of the BROWN UNIVERSITY DEFERRED VESTING RETIREMENT PLAN, and the BROWN UNIVERSITY LEGACY RETIREMENT PLAN, <br><br> Plaintiffs, <br><br> vs. <br><br> BROWN UNIVERSITY in Providence in the State of Rhode Island and Providence Plantations <br><br> Defendant. | Civil Action No. <br><br> **COMPLAINT – CLASS ACTION** <br><br> JURY TRIAL DEMANDED |

1.     Plaintiffs Diane G. Short, Samira Pardanani, Judith Daviau, and Joseph Barboza (collectively, "Plaintiffs"), individually and as representatives of a class of participants and beneficiaries of the Brown University Deferred Vesting Retirement Plan ("Deferred Vesting Retirement Plan") and the Brown University Legacy Retirement Plan[1] ("Legacy Retirement Plan"; together, the "Plans"), bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plans against Defendant Brown University in Providence in the State of Rhode Island and Providence Plantations (referred to herein as the "University" or "Defendant") for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§1001-1461

---

[1] Brown University maintains two 403(b) retirement plans for faculty and staff: The Legacy Retirement Plan, for those hired before March 1, 2001, and the Deferred Vesting Retirement Plan, for those hired after that date.

("ERISA").

2.      The duties of loyalty and prudence are among the highest known to the law and require fiduciaries to perform their obligations solely in the best interests of the participants and beneficiaries. As a fiduciary to the Plans, Defendant is obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plans' investments are prudent. Because the marketplace for retirement plan services is established and competitive, and because the Plans have more than a billion dollars in assets, the Plans have tremendous bargaining power to demand low-cost administrative and investment management services and well-performing investment funds.

3.      But, instead of leveraging the Plans' substantial bargaining power to benefit participants and beneficiaries, Defendant caused the Plans to pay unreasonable and excessive fees for investment and administrative services. Further, Defendant selected and retained investment options for the Plans that historically and consistently underperformed their benchmarks and charged excessive investment management fees.

4.      Rather than negotiating separate, reasonable, and fixed fees for recordkeeping, Defendant continuously retained investment choices and share classes that charged higher fees than other less expensive share classes that were available for the Plans for the same investment funds. As a result, Plaintiffs paid an asset-based fee for administrative services that continued to increase with the increase in the value of a participant's account even though no additional services were being provided.

5.      Further, Defendant was responsible for regularly monitoring all the Plans' investment choices and for periodically reviewing and evaluating the entire investment choice menu to determine whether it provided an appropriate range of investment choices into which

participants could direct the investment of their accounts. Defendant, however, failed in those duties and retained certain investment options for the Plans that historically and consistently underperformed their benchmarks and charged excessive fees.

6.     Defendant selected as the Plans' principal capital preservation fund an insurance company fixed-income account, the TIAA Traditional Annuity, that prohibited participants from re-directing their investment in the Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives changed. The TIAA Traditional Annuity also prohibits participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they paid a 2.5% surrender charge that bears no relationship to any reasonable risk or expense to which the fund has been subject.

7.     One could reasonably infer from these circumstances alone that the Defendant's fiduciary decision-making process was either flawed or badly executed. However, the weight of the evidence demonstrates that there is a flawed process, such as:

    a.  On or before December 31, 2014, the Legacy Retirement Plan offered a bewildering array of 175 investment options through Fidelity Investments and offered an additional 24 investment options through TIAA-CREF, which included numerous duplicative investment choices (*e.g.*, 9 target retirement date funds offered by Fidelity Investments and 9 target retirement date funds offered by TIAA CREF);

    b.  As of December 31, 2015, the Legacy Retirement Plan offered at least 35 investment options through TIAA-CREF and offered at least 26 investment

options through Fidelity Investments, which continued to include numerous duplicative fund choices (*e.g.*, 12 target retirement date funds offered by Fidelity Investments and 11 target retirement date funds offered by TIAA CREF, and nearly identical S&P 500 Index funds offered by both Fidelity Investments and Vanguard);

c.   On or before December 31, 2014, the Deferred Vesting Retirement Plan offered a bewildering array of 177 investment options through Fidelity Investments and offered an additional 26 investment options through TIAA-CREF, which included numerous duplicative investment choices (*e.g.*, 10 target retirement date funds offered by Fidelity Investments and 11 target retirement date funds offered by TIAA CREF) and dozens of highly specialized funds that lack diversification and inappropriate for inclusion in a menu of investment choices in a participant-directed individual account plan;

d.   As of December 31, 2015, the Deferred Vesting Retirement Plan offered at least 35 investment options through TIAA-CREF and offered at least 26 investment options through Fidelity Investments, which continued to include numerous duplicative fund choices (*e.g.*, 12 target retirement date funds offered by Fidelity Investments and 11 target retirement date funds offered by TIAA CREF, and nearly identical S&P 500 Index funds offered by both Fidelity Investments and Vanguard); and

e.   Approval of a TIAA loan program that required excessive collateral as security for repayment of the loan, charged grossly excessive fees for administration of the loan, and violated U.S. Department of Labor ("DOL") rules for participant loan

programs.

8.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendant's personal liability under 29 U.S.C. §1109(a) to restore to the Plans all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## I.      JURISDICTION AND VENUE

9.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

10.      This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plans are administered, where at least one of the alleged breaches took place and where Defendant resides.

## II.      THE LEGACY RETIREMENT PLAN AND THE DEFERRED VESTING RETIREMENT PLAN

11.      The Plans are defined contribution, individual account, employee pension benefit plans as defined under 29 U.S.C. §1002(2)(A) and §1002(34).

12.      The Plans are established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

13.      Eligible faculty and staff members of Brown University are able to participate in the Plans. The Plans provide the primary source of retirement income for many employees of Brown University. The Plans are based upon deferrals of employee compensation and employer

matching contributions. The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plans by the University net of fees and expenses. Participants have the right to direct the investment of their accounts among the available investment choices

14.     Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion).

15.     With more than **$1 billion** in assets as of December 31, 2015, the Legacy Retirement Plan alone qualifies as a "Mega" plan. The Legacy Retirement Plan had 6,325 participants as of December 31, 2014 and 4,535 participants as of December 31, 2015. Likewise, the Deferred Vesting Retirement Plan had more than $244 million in assets as of December 31, 2015. The Deferred Vesting Retirement Plan had 8,054 participants as of December 31, 2014 and 9,594 participants as of December 31, 2015.

## III.    THE PARTIES

### a.    **Plaintiffs**

16.     Plaintiff Diane G. Short, a resident of Glocester, Rhode Island, is a participant in the Legacy Retirement Plan as defined under 29 U.S.C. §1002(7) because she has a vested account balance in the Legacy Retirement Plan and her beneficiaries are or may become eligible to receive benefits under the Plan. Through the Legacy Retirement Plan she has invested in the TIAA Traditional Annuity, CREF Stock Account, TIAA Real Estate Account, CREF Bond Market Account, CREF Growth Account, and CREF Global Equities Account, as well as other mutual funds offered by the Plan.

17.     Plaintiff Samira Pardanani, a resident of Shoreline, Washington, is a participant in

6

the Legacy Retirement Plan as defined under 29 U.S.C. §1002(7) because she has a vested account balance in the Legacy Retirement Plan and her beneficiaries are or may become eligible to receive benefits under the Legacy Retirement Plan. Through the Legacy Retirement Plan she is invested in the TIAA Traditional Annuity, CREF Equity Index Account, CREF Bond Market Account, and CREF Global Equities Account.

18.    Plaintiff Judith Daviau, a resident of Cumberland, Rhode Island, is a participant in the Deferred Vesting Retirement Plan as defined under 29 U.S.C. §1002(7) because she has a vested account balance in the Deferred Vesting Retirement Plan and her beneficiaries are or may become eligible to receive benefits under the Deferred Vesting Retirement Plan. Through the Deferred Vesting Retirement Plan she has invested in the TIAA Traditional Annuity, CREF Stock Account, CREF Equity Index Account, and CREF Growth Account, as well as other mutual funds offered by the Plan.

19.    Plaintiff Joseph Barboza, a resident of Port St. Lucie, FL, is a participant in the Legacy Retirement Plan as defined under 29 U.S.C. §1002(7) because he has a vested account balance in the Legacy Retirement Plan and his beneficiaries are or may become eligible to receive benefits under the Plan. Through the Legacy Retirement Plan he is invested in the TIAA Traditional Annuity, the CREF Growth Account, the CREF Equity Index Account, and the CREF Global Equities Account.

b.  **Defendant**

20.    Brown University in Providence in the State of Rhode Island and Providence Plantations (the "University" or "Defendant") is a private, not-for-profit, nonsectarian institution of higher learning non-profit educational institution with its principal place of business in Providence, Rhode Island. The University is governed by a Board of Trustees.

21.     Brown University is the Plan Administrator under 29 U.S.C. §1002(16)(A)(i) for the Plans. As the Plan Administrator, the University "is responsible for day-to-day plan operations. The Plan Administrator is a 'named fiduciary' for purposes of section 402(a)(1) of ERISA."[2]

22.     As the Plan Administrator for each of the Plans, the University is vested with exclusive and complete responsibility and discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

**23.**     The University is a fiduciary to the Plans because it has exercised and continues to exercise discretionary authority or discretionary control respecting the management of the Plans and the management and disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii). The University has acknowledged that it is the Plan Administrator in each of the Plans' Summary Plan Descriptions and in forms 5500 filed with the U.S. Department of Labor.

## IV.     FACTS APPLICABLE TO ALL COUNTS

### I. Plan investments

24.     Defendant exercised and continues to exercise discretionary authority over the investment options that are included in the Plans. The Plans' investments are designated by

---

[2] *See* the Deferred Vesting Retirement Plan Summary Plan Description, at 11, which is available at: https://www.brown.edu/about/administration/human-resources/sites/human-resources/files/DeferredVestingPlanSummaryPlanDescription.pdf.

Defendant as available investment alternatives offered under the Plans.

25.     As of December 31, 2014, the Legacy Retirement Plan offered a bewildering array of 175 investment options through Fidelity Investments and offered an additional 24 investment options through TIAA-CREF, which include numerous duplicative investment choices (e.g., 9 target retirement date funds offered by Fidelity Investments and 9 target retirement date funds offered by TIAA CREF).

26.     As of December 31, 2015, the Legacy Retirement Plan offered at least 35 investment options through TIAA-CREF and offered at least 26 investment options through Fidelity Investments, which continued include numerous duplicative fund choices (e.g., 12 target retirement date funds offered by Fidelity Investments and 11 target retirement date funds offered by TIAA CREF, and nearly identical S&P 500 Index funds offered by both Fidelity Investments and Vanguard).

27.     As of December 31, 2014, the Deferred Vesting Retirement Plan offered a bewildering array of 177 investment options through Fidelity Investments and offered an additional 26 investment options through TIAA-CREF, which include numerous duplicative investment choices (*e.g.*, 10 target retirement date funds offered by Fidelity Investments and 11 target retirement date funds offered by TIAA CREF).

28.     As of December 31, 2015, the Deferred Vesting Retirement Plan offered at least 35 investment options through TIAA-CREF and offered at least 26 investment options through Fidelity Investments, which continued include numerous duplicative fund choices (*e.g.*, 12 target retirement date funds offered by Fidelity Investments and 11 target retirement date funds offered by TIAA CREF, and nearly identical S&P 500 Index funds offered by both Fidelity Investments and Vanguard)The Plans offer thirty-five investments choices managed by the Teachers

Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), including variable annuities, registered investment companies and a pooled separate account.

29.     The TIAA Traditional Annuity offered in the Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

30.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans. For example, for participants who invest in the TIAA Traditional Annuity through a Group Retirement Annuity (GRA) contract, like the ones held in the Plans, lump-sum withdrawals are available from the Traditional Annuity only within 120 days after termination of employment, and withdrawals are subject to a 2.5% surrender charge. All other withdrawals and transfers from the account must be paid in ten annual installments, rather than being available to participants if they wish to liquidate their funds earlier. The only way for participants to withdraw or change their investment in the TIAA Traditional Annuity is to spread the withdrawal over a ten-year period, unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without a substantial penalty can only do so over ten years.

31.     The Plans' CREF Stock Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, CREF Social Choice Account, CREF Bond Market Account, CREF Global Equities Account, CREF Growth Account, and CREF Equity Index Account are variable annuities that invest in underlying securities for a given investment style. The value of

the Plans' investment in these variable annuities changes over time based on investment performance and expenses of the accounts.

32.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges. For the R1 share class, which was the only share class available prior to 2015, those expenses consisted of the following:

      a. "administrative expense" charge (39.5 bps); [3]

      b. "distribution expense" charge (16.5 bps);

      c. "mortality and expense risk" charge (0.5 bps); and

      d. "investment management expense" charge (ranging from 4 to 15 bps).

33.     The TIAA Real Estate Account is an insurance company separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2016, these charges consisted of the following:

      a. "administrative expense" charge (26.5 bps);

      b. "distribution expense" charge (12.5 bps);

      c. "mortality and expense risk" charge (0.5 bps);

      d. "liquidity guarantee" (17 bps); and

      e. "investment management expense" charge (32 bps).

34. The remaining TIAA-CREF funds are registered investment companies under the

---

[3] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2017.

Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge "distribution, marketing, and other expenses, depending on the type of investment and share class.

**II.      Defendant's actions caused participants in the Plans to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.**

35.      Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to jumbo defined contribution plans, like the Plans. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

36.      To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans solicit competitive bids for the plan's recordkeeping and administrative services at regular intervals of approximately five years.

37.      The cost of recordkeeping and administrative services depends on the number of participants. The cost does not depend on the asset balance of the plan or the amount of savings held in a participant's account. Thus, the cost of providing recordkeeping services to a plan with an average account balance of $50,000 is the same as the cost of recordkeeping for a plan with the same number of participants and a $5,000 average account balance. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

38.     Mega or jumbo plans, like the Legacy Retirement Plan (or the Legacy and Deferred Vesting Retirement Plans together), possess tremendous economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant cost for recordkeeping and administrative services declines, as should the fee charged for those services. These lower administrative expenses are readily available for plans with a greater number of participants.

39.     A practice called revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based compensation for the recordkeeper, that is, recordkeeping expense calculated as a percentage of total plan assets, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks paid by high-priced funds to recordkeepers to induce the recordkeepers to cause the high-priced funds to be included as plan investment options.

40.     Prudent fiduciaries of defined contribution plans that are of similar size as the Plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages all plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when

more than one recordkeeper is used.

41.    According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, 403(b) Plan Sponsor Research (2013).[4]

42.    It is well known in the defined contribution industry that plans with dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

> **1. The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.

> **2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009) (emphasis in original).[5]

43.    The benefits of using a single recordkeeper are clear:

> By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[6]

44.    In a study titled "How 403(b) Plan Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It," Aon Hewitt similarly recognized:

> 403(b) plan sponsors can dramatically reduce participant-borne costs while improving

---

[4] Available at:
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.
[5] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

[6] *Id.*

employees' retirement readiness by:

> – Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

> – Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

> – Leveraging aggregate plan size and scale to negotiate competitive pricing.

Aon Hewitt, *How 403(b) Plan are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[7]

45.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> [H]igh investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight . . . . Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[8]

46.     Others in the industry agree. *See*, *e.g.*, Kristen Heinzinger, Paring Down Providers: A 403(b) Sponsor's Experience, PLANSPONSOR (Dec. 6, 2012) ("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses.

---

[7] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plan_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[8]  Available  at  https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[9] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010) (identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors").[10]

47.     Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the Plan. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[11]

48.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, since at least 2012, Defendant has contracted with *two* recordkeepers (TIAA-CREF and Fidelity Investments) for the Deferred Vesting Retirement Plan. The inefficient and costly structure maintained by Defendant has caused participants of the Deferred Vesting

---

[9]     Available at: http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[10] Available at: http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[11]     Available at: http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

Retirement Plan to pay and continue to pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services. There is no loyal or prudent reason for Defendant's failure to engage in a process to reduce duplicative services and the fees charged to the Deferred Vesting Retirement Plan or to continue with two recordkeepers to the present.

49.     The inefficiencies of contracting with two recordkeepers is underscored by the numerous and duplicative investment choices offered by the Deferred Vesting Retirement Plan. As of December 31, 2014, the Deferred Vesting Retirement Plan offered a bewildering array of 177 investment options through Fidelity Investments as recordkeeper and offered an additional 26 investment options through TIAA-CREF as recordkeeper, which include numerous duplicative investment choices (*e.g.*, 10 target retirement date funds offered by Fidelity Investments and 11 target retirement date funds offered by TIAA CREF). As of December 31, 2015, the Deferred Vesting Retirement Plan continued include numerous duplicative fund choices (*e.g.*, 12 target retirement date funds offered by Fidelity Investments as recordkeeper and 11 target retirement date funds offered by TIAA CREF as recordkeeper).

50.     The Deferred Vesting Retirement Plan also offers duplicative funds that are intended to track the performance of certain market indices, including: (a) the U.S. Aggregate Bond Index (*i.e.*, the Fidelity® U.S. Bond Index Fund offered through Fidelity Investments as recordkeeper and the Vanguard Total Bond Market Index Fund offered through TIAA-CREF as recordkeeper); (b) the S&P 500 Index (Fidelity® 500 Index Fund offered through Fidelity Investments as recordkeeper and the Vanguard 500 Index Fund offered through TIAA-CREF as recordkeeper); and (c) the Total International Composite Index (*i.e.*, the Fidelity® International Index Fund offered through Fidelity Investments as recordkeeper and the Vanguard Total International Stock Index Fund offered through TIAA-CREF as recordkeeper).

51.     Each of the Deferred Vesting Retirement Plan's recordkeepers received or currently receives compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plans and its investments for providing these duplicative funds.

52.     Upon information and belief and according to industry experts and the prospectus for the CREF Retirement Equities Fund, which includes the eight CREF variable annuities (*see* paragraph 31 above), the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Deferred Vesting Retirement Plan's TIAA-CREF investments are set forth below:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 56 bps |
| Premier share class of TIAA-CAF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 39 bps |
| TIAA Traditional Annuity | 15 bps |

53.     TIAA-CREF and Fidelity Investments are compensated for recordkeeping services based on internal revenue sharing they receive from the annuities and mutual funds sold to the Deferred Vesting Retirement Plan.

54.     In addition, the Plan's recordkeepers receive additional indirect compensation, including revenue sharing for non-proprietary funds, float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread and redemption fees.

55.     Based on information currently available to Plaintiffs regarding the Plans' features, the nature of the administrative services provided by the Plans' recordkeepers, the Plans' participant level, and the recordkeeping market, benchmarking data indicates that a

reasonable recordkeeping fee for the Plans would have been a fixed amount between $500,000 and $650,000 (approximately $35-$45 per participant with an account balance and an estimated total of 14,379 participants in the Plans).

56.     An examination of the prospectuses for the TIAA and CREF funds available as investment choices and the Plans' financial data, it is clear that the Plans paid at least hundreds of dollars per participant per year from 2010 to 2015 for recordkeeping; much higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

57.     Based on calculations derived from examination of the Plans' 5500's, TIAA received indirect compensation for recordkeeping and administrative services of $3.9 million from only the CREF variable annuities, the TIAA CREF Real Estate Account, and the TIAA Traditional Annuity, without regard to any other indirect compensation received form, for example, plan loans and revenue sharing from the TIAA mutual funds, and the spread between the earnings on TIAA's general account investments and the interest rate credited to participants under the Traditional Annuity. With 13,000 participants in both plans, participants were paying an average of $300 annually for recordkeeping.   Moreover, many of these participant like Plaintiff Shorts, have accounts in both plans, so the average cost for recordkeeping per participant is actually much greater.   None of this indirect compensation was reported on any of the Savings Plan's Annual Returns filed with the U.S. Department of Labor ("DOL") Employee Benefit Security Administration ("EBSA") on Form 5500, in violation of the explicit obligation to do so under federal law.

58.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The EBSA has noted that a 1% higher level of fees over a 35-year period makes a 28%

difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[12]

59.     Defendant also failed to control recordkeeping costs as the Plans' assets grew. From December 31, 2008 to December 31, 2015, the Legacy Plan's assets alone increased by approximately 68% from $733,681,683 to $1,075,013,274. Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plans' recordkeepers became even more excessive as the Plans' assets grew, even though the administrative services provided to the Plans remained the same. Defendant could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plans as other loyally and prudently administered plans do, but failed to do so.

60.     Defendant failed prudently to monitor and control the compensation paid by the Plans for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plans' recordkeepers. Had Defendant monitored the compensation paid to the Plans' recordkeepers and ensured that participants were charged only reasonable fees for administrative and recordkeeping services, participants in the Plans would not have lost millions of dollars in their retirement savings in the last six years alone.

61.     Annual Returns on Form 5500 provide substantial evidence of that failure. The Plans' 5500's are essentially the Plan' annual tax returns. DOL rules expressly require that plan service providers report all direct and indirect compensation received for the year in connection with those services. None of the Plans' 5500's filed since 2009 disclose the amount of any indirect compensation being received by TIAA.  Whether these reporting errors were caused by TIAA's and Fidelity Investments' reporting deficiencies or by Brown University's

---

[12] Available at: http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

misrepresentation of TIAA's and Fidelity Investments' accurate reporting, the implication is the same—Brown University failed in its obligations to the Plan and its participants.

### V. Defendant imprudently retained historically underperforming Plan investments.

62.     Given Defendant's failure to conduct appropriate due diligence in selecting and retaining Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plans.

#### a. CREF Stock Account

63.     Investments in the CREF Stock Account as of December 31, 2015 represent roughly 22 percent of the Legacy Plan's assets, and 11 percent of the Deferred Vesting Retirement Plan's assets, and the CREF Stock Account has been included as an investment option in these Plans from at least 2009 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has historically underperformed and continues to underperform its benchmark and lower-cost actively and passively managed investments that have been available to the Plan.

64.     TIAA-CREF imposed restrictive provisions on the specific annuities that must be provided in the Plan. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plan without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-

CREF for recordkeeping services. Prior to creation of three separate share classes for the CREF Stock Account in mid-2015, the CREF Stock Account paid 56 bps for revenue sharing as administrative expense and "distribution fees", which exceeded other TIAA-CREF investments by over 50% (15 bps).

65.     Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed large cap option for the particular investment style and asset class.

66.     Defendant failed to undertake such analysis when it selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. Defendant also provided the fund option without conducting a prudent analysis despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market, and active managers do not outperform passive managers net of fees in this investment style.

67.     Had such an analysis been conducted by Defendant, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

68.     Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendant and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the

22

fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Pl) (VITPX) and the Vanguard Institutional Index (Inst Pl) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.



69.     The CREF Stock Account, with an expense ratio of 46 bps as of December 31,

2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

70.     Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), the Vanguard PRIMECAP (Adm) (VPMAX), and the Vanguard Capital Opp. (Adm) (VHCAX).



71.    The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[13]

---

[13] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.







72.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (40 bps), the Vanguard PRIMECAP (Adm) (35 bps), and the Vanguard Capital Opp. (Adm) (40 bps).

73.    Apart from the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, Aon Hewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan. Aon Hewitt, TIAA-CREF Asset Management, INBRIEF, at 3 (July 2012).[14] This recommendation was due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio

---

[14]    Available    at:    http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id*. at 4-5.

74.      In 2015, the Supreme Court unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendant failed to conduct a prudent process to monitor the CREF Stock Account and continues to retain the fund despite its continuing underperformance compared to lower-cost investment alternatives readily available to the Plan and the opinion of one of the foremost authorities in the retirement investment industry that *no* retirement plan should own this fund.

75.      Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

76.      Had the Defendant removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives or the passively managed lower-cost alternatives, as set forth below, participants in the Plans would not have lost millions of dollars' worth of their retirement savings.

**B.      TIAA Real Estate Account**

77.      Defendant selected and continues to offer the TIAA Real Estate Account as a real estate investment option in the Plans. Investments in the TIAA Real Estate Account as of December 31, 2015 represent roughly 9.8 percent of the Employee Plan's assets. The TIAA Real

Estate Account has far greater fees than are reasonable, has historically underperformed, and continues to underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

78. With an expense ratio of 88.5 bps as of December 31, 2014, the TIAA Real Estate Account is nearly eleven times more expensive than the Vanguard REIT Index (Inst), which has an expense ratio of 8 bps.



79. Simply stating the expense ratio does not tell the whole story of fund expenses. TIAA disclosures indicate that included in the TIAA Real Estate Account's investment management fees is the expense of an independent fiduciary that is retained to approve appraisers of the Account's assets, ensure that acquisitions meet the Account's investment

guidelines, and pass on various other aspects of the operation of the Account. In fact, TIAA selects the appraisers and the Account's investments, and determines all other matters relating to the management of the Account that are then subject to the approval of the independent fiduciary. The reason that the Account needs the services of an independent fiduciary is to ensure that TIAA, as the manager of the Account, does not engage a variety of prohibited transactions, including self-dealing transactions. By obtaining the approval of the independent fiduciary, TIAA is able to engage in transactions with parties-in-interest, including related parties, which it otherwise could not engage in. In other words, the independent fiduciary is required in order to allow TIAA actually to manage the Real Estate Account and offer it as an investment choice to retirement plans. It is an expense that should be borne entirely by TIAA as a cost of engaging in the business, not a legitimate expense of the operation of the Account.

80.     The TIAA Real Estate Account had a long history of substantial under-performance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009. Despite this, Defendant selected and continues to retain it in the Plan.



81.     This underperformance occurred for years before 2009 and has continued afterward. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending December 31, 2014.



82.    The very design of the TIAA Real Estate Account creates such operational difficulties, and burdens investors in the fund with such significant additional expense, that a reasonable plan fiduciary should have questioned whether the fund was an appropriate investment at all for participant-directed individual account plans like the Plans.

83.    The TIAA Real Estate Account is an insurance company pooled separate account, meaning that all the assets held in the account are plan assets and all the transactions involving those assets are subject to the prohibited transaction rules of ERISA § 406. As a result, TIAA has had to obtain an individual prohibited transaction exemption from the Employee Benefit Security Administration of the DOL just to be able to offer the fund as an investment choice to ERISA

plans. One of the conditions of that exemption is that TIAA must retain the services of an independent fiduciary to review and approve nearly every transaction in which the fund engages, adding significant additional expense to the operation of the fund, as noted above.

84.    Additionally, the fund invests directly in real property assets that are highly illiquid.  In order to manage the liquidity problem, TIAA guarantees the liquidity of participant accounts invested in the Real Estate Account, but charges participants an additional 17 basis points for that liquidity guarantee.

85.    The Real Estate Account charges participants 29.5 basis points for recordkeeping expense, whereas the R3 share classes of the TIAA variable annuities currently charge only 14.5 basis points. A reasonable fiduciary would have questioned why, for a participant invested in the Real Estate Account, recordkeeping should cost double what it costs a participant invested in the variable annuities, and would have determined that there is no difference in cost, especially when all the accounting, appraisal and other costs associated with valuation are already being paid by the Real Estate Account.

86.    Finally, the Real Estate Account has and continues to charge 12.5 basis points for "distribution fees." Any reasonable fiduciary would have questioned why TIAA is charging a distribution fee to distribute its own fund; this is a fee that gets paid to TIAA. The fact that TIAA may require plans to include the Real Estate Account in a plan's menu of investment choices only adds insult to injury.

87.    The Real Estate Account's poor performance coupled with 44.5 basis points in excessive fees makes the TIAA Real Estate Account an exceedingly poor choice by any measure and speaks for itself in evaluating the performance of Defendant's fiduciary obligation to act solely in the best interest of participants for the exclusive purpose of providing them benefits

under the Plans.

88.     As the Supreme Court unanimously ruled in Tibble, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. In contrast, the Defendant failed to conduct such a process and continues to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

89.     Had Defendant removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index, Plan participants would not have lost millions of dollars' worth of their retirement savings.

### B.     TIAA Traditional Annuity

90.     Investments in the TIAA Traditional Annuity as of December 31, 2015 represent roughly 36 percent of the Legacy Plan's assets, and roughly 10.7 percent of the Deferred Vesting Retirement Plan's assets, and the TIAA Traditional Annuity has been included as an investment option in these Plans from at least 2009 to date. The TIAA Traditional Annuity prohibits participants from re-directing their investment in that Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives changed. The Traditional Annuity also prohibits participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they paid a 2.5% surrender charge that bore no relationship to any reasonable risk or expense to which the fund was subject.

91.     The TIAA Traditional Annuity is an insurance company general account product,

meaning that all of the assets supporting the annuity contract are held in TIAA's general account, and invested along with all the other assets in TIAA's general account. All of the assets of the TIAA general account are available to support the obligations of the Traditional Annuity.

92.     One of the fundamental requirements of ERISA is that every contract or agreement between a plan and an investment manager like TIAA is that no contract or arrangement is reasonable within the meaning of section 408(b)(2) of ERISA if it does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous.

93.     As expressly noted in 29 CFR 2550.408b-2(c)(3), a provision in a contract, lease or other arrangement which reasonably compensates the service provider or lessor for loss upon early termination is not a penalty. For example, a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty. Similarly, a provision in a lease for a termination fee that covers reasonably foreseeable expenses related to the vacancy and re-letting of the office space upon early termination of the lease is not a penalty. Such a provision does not reasonably compensate for loss if it provides for payment in excess of actual loss or if it fails to require mitigation of damages.

94.     The 2.5% surrender charge imposed by the TIAA Traditional Annuity on lump sum withdrawals completely fails to take into account the financial conditions of the TIAA general account, constituting a clear and patent violation of the prohibition on a penalty for early withdrawal from the contract. Suppose, for example, that in connection with the investment of participant accounts in the Traditional Annuity, TIAA acquired long-term bonds paying an interest rate of 4%, and that Plaintiffs have invested in the Traditional Annuity for twenty years

before their respective retirement dates. If, at retirement, those bonds have increased in value by 10% due to changes in prevailing interest rates, and each Plaintiff requests a lump sum distribution, TIAA could easily sell those bonds at a profit and pay each of them lump sum distributions. Instead, getting a lump sum distribution will cost each Plaintiff a 2.5% surrender charge, ostensibly to protect TIAA from a loss it would not incur. A surrender charge that is always imposed for the life of a contract, regardless of the term of a participant's investment in the contract and regardless of the financial condition of TIAA's general account at the time of withdrawal, is *per se* unreasonable because it will invariably result in charges that are wholly unrelated to any actual loss.

95.    To have accepted these conditions for the investment of plan assets indicates that either: (i) Defendant failed in its obligation to thoroughly understand the terms of the contract or (ii) failed to act in the best interest of plan participants in accepting such unreasonable terms.

96.    Even if the Defendant was blissfully and excusably unaware of the nature of the surrender change at the time of the initial investment in the contract, the DOL's release of its final regulation under ERISA § 408(b)(2), *Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure* (the "408b-2 Disclosure Rule"), on February 2, 2012 should have alerted it to issue.

97.    Release of the 408b-2 Disclosure Rule was a significant event. No reasonable responsible plan fiduciary could have missed it, since it required affirmative compliance of virtually every plan service provider and fiduciary by July 2012.

98.    The 408b-2 Disclosure Rule contains an express provision in 29 CFR 2550.408b-2(c)(3), referenced above, addressing the requirement for contacts to be terminable on reasonably short notice without penalty. In fact, insurance companies discussed the issue of surrender

charges with the DOL prior to the issuance of the final rule.  As noted in the Preamble to the

Interim Final Rule:

> ***Other commenters raised questions as to whether certain fees and market value adjustments, generally associated with insurance or insurance-type services and investments, constitute "penalties" for purposes of this paragraph of the regulation.*** The regulation provides specifically that "a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty." ***The Department believes that questions as to whether, for any particular contract, the charges for contract termination are in fact "penalties," rather than a service provider's recoupment of reasonable start-up costs, are inherently factual questions; accordingly, the Department did not amend the rule in response to these comments.*** After consideration of all of the comments on paragraph (c)(2) of the proposal, the Department has determined to adopt that paragraph, without change, in the interim final rule, except that this provision has been moved to a new paragraph (c)(3) of the interim final rule.

(Emphasis added.)

99.     Accordingly, the very existence of a 2.5% surrender charge that never varies

regardless of the financial consequence of the withdrawal is unreasonable, and the acceptance of

such terms, a breach of fiduciary duty.

## ERISA'S FIDUCIARY STANDARDS

100.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendant as fiduciary of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
>> (A)     for the exclusive purpose of:
>>
>>> (i) providing benefits to participants and their beneficiaries; and
>>> (ii) defraying reasonable expenses of administering the plan; [and]
>>
>> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

101.    Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

102.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

103.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

104.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan

resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

105.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

106.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following classes:

**The Deferred Vesting Retirement Class**

All participants and beneficiaries of The Brown University Deferred Vesting Retirement Plan from June __, 2011, through the date of judgment, excluding the Defendant or any participant who is a fiduciary to the Plan (the "Deferred Vesting Plan Class").

**The Legacy Retirement Plan Class**

All participants and beneficiaries of the Brown University Legacy Retirement Plan from June __, 2011, through the date of judgment, excluding the Defendant or any participant who is a fiduciary to the Plan (the "Legacy Plan Class").

107.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Classes, in aggregate, include over 14,000 members (the Deferred Plan Class includes approximately 8,000 members and the Legacy Plan Class includes approximately 6,000 members), and is so large that joinder of all its members is

impracticable.

b. There are questions of law and fact common to the Classes because the Defendant owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendant's breach of duty.

c. Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs were participants during the time period at issue in this action and all participants in the Plans were harmed by Defendant's misconduct.

d. Plaintiffs are adequate representatives of the Classes because they were participants in the Plans during the Class period, have no interest that is in conflict with the Classes they seek to represent, are committed to the vigorous representation of the Classes and have engaged experienced and competent attorneys to represent the Classes.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of: (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of its fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a); and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies

for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

108.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no member of the Classes has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

109.    Plaintiffs' counsel will fairly and adequately represent the interests of the Classes and are best able to represent the interests of the Classes under Rule 23(g).

## COUNT I

**Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees**

110.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

111.    The scope of the fiduciary duties and responsibilities of Defendant includes discharging its duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA. Defendant is directly responsible for ensuring that the Plans' fees are

reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

112.    Defendant selected and retained as the Plans' investment options investment funds and insurance company annuities that caused the Plans to incur far higher administrative fees and expenses relative to the size and complexity of the Plans.

113.    For years Defendant failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plans to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being provided.

114.    Had a prudent and loyal fiduciary conducted a process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services.

115.    Defendant's failure to properly evaluate the reasonableness of amounts being charged to the Plans have caused Plaintiffs and the Classes millions of dollars in direct economic loss. The Plans' total losses will be determined after complete discovery in this case and are continuing.

116.     Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT II

**Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees and Performance Losses**

117.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

118.     The scope of the fiduciary duties and responsibilities of Defendant includes managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendant is directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

119.     As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

120.     Defendant selected and retained as Plan investment options investment funds and insurance company annuities with far higher expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

121.     Rather than consolidating the Plans' many investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendant retained duplicative investment options in many asset classes and investment styles.

122.     Defendant failed to engage in a prudent process for the selection and retention of

Plan investment options. Rather, Defendant used more expensive funds with inferior historical performance than investments that were available to the Plans.

123.     CREF Stock Account: Defendant selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments with similar underlying asset allocations.

124.     TIAA Real Estate Account: Defendant selected and retained the TIAA Real Estate Account for the real estate investment in the Plans despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

125.     TIAA Traditional Annuity: Defendant failed to thoroughly evaluate the surrender charges imposed on plan participants wishing to take a lump sum distribution or worse, knowingly saddled participants with severe restrictions on their ability to withdraw from the Traditional Annuity, even at retirement, without the imposition of a penalty.

126.     Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

127.     Total Plan losses will be determined after complete discovery in this case and are continuing.

128.     Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

44

## COUNT III

**Prohibited Transaction – Lending of Money or Other Extension of Credit
Between a Plan and a Party in Interest**

129.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

130.    ERISA § 406(a)(1)(B), 29 U.S.C. §1106(a)(1)(B), provides that a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest.

131.    Defendant is a fiduciary responsible for arranging for and administering the participant loan program with respect to the Plans.

132.    Defendant is a fiduciary responsible for determining the interest rate for participant loans, for transferring assets from the accounts of participants who take loans from their retirement accounts to the Defendant's Traditional Annuity or to a Retirement Loan certificate, and for determining the interest rate participants will receive on their loan "collateral" invested in the Traditional Annuity or in Retirement Loan certificate.

133.    By accepting and approving the design and administration of a loan program in a manner intended to benefit TIAA, a party in interest to the Plans, at the expense of Plaintiffs and members of the Classes, violated its duty of loyalty set forth in ERISA § 404(a).

134.    By accepting and approving the design and administration of a loan program that violated the conditions for the exemption available for plan loans set forth in 29 CFR 2550.408b-1, Defendant has caused the Plans to engage in prohibited transactions in violation of ERISA § 406(a).

135.    Defendant is liable under 29 U.S.C. §1109(a) to make good to Plaintiffs and the Classes losses resulting from the prohibited transactions alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT IV

**Prohibited Transaction – Transfer of Plan Assets to or for the Use of a Party in Interest**

136.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

137.    ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D), prohibits a plan fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

138.    ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B) provides that a "party in interest" includes "a person providing services to [a] plan."

139.    TIAA is a party in interest with respect to Plaintiffs, the Plans, and the Classes, providing record keeping, custodial, and other investment and administrative services to the Plans.

140.    The requirement that participants in the Plans must transfer a portion of a their accounts to TIAA as security for repayment of a plan loan constitutes a prohibited transfer of plan assets to or for the use and benefit of TIAA, a party in interest, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D).

141.    By requiring that the Plaintiffs and members of the Classes to transfer a portion of a their retirement savings to TIAA as security for repayment of a participant loan, as a result of

which TIAA will earn the spread between the interest charged to the participant for the loan and the interest paid by TIAA to the plan participant through the Traditional Annuity or the Retirement Loan certificate, Defendant is causing the Plans to transfer plan assets to or for the use and benefit of a party in interest in violation of ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D).

142.    Defendant is liable under 29 U.S.C. §1109(a) for all losses to Plaintiffs and members of the Classes resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

• Find and declare that the Defendant has breached its fiduciary duties as described above;

• Find and adjudge that Defendant is personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duties, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

• Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

• Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plans under §1109(a);

• Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

• Surcharge against Defendant and in favor of the Plans all amounts involved in any

transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

• Reform the Plans to include only prudent investments;

• Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

• Certify the Classes, appoint each of the Plaintiffs as a class representative, and appoint Schneider Wallace Cottrell Konecky Wotkyns LLP, Berger & Montague P.C., and Law Offices of Sonja L. Deyoe as Class Counsel;

• Award to the Plaintiffs and the Classes their attorney's fees and costs under 29 U.S.C.

§1132(g)(1) and the common fund doctrine;

• Order the payment of interest to the extent it is allowed by law; and

• Grant other equitable or remedial relief as the Court deems appropriate.

By:     /s/ Sonja L Deyoe
        Sonja L. Deyoe (R.I. Bar No. 6301)
        Law Offices of Sonja L. Deyoe
        395 Smith Street
        Providence, RI 02908
        Telephone: (401) 864-5877
        Facsimile: (401) 354-7464
        sld@the-straight-shooter.com

        Garrett W. Wotkyns*
        John J. Nestico*
        Michael McKay*
        SCHNEIDER WALLACE COTTRELL
        KONECKY WOTKYNS LLP
        8501 N. Scottsdale Road, Suite 270
        Scottsdale, Arizona  85253
        Telephone: (480) 428-0145
        Facsimile: (866) 505-8036
        gwotkyns@schneiderwallace.com
        mmckay@schneiderwallace.com
        jnestico@schneiderwallace.com

        Todd Schneider*
        SCHNEIDER WALLACE COTTRELL
        KONECKY WOTKYNS LLP
        2000 Powell Street, Suite 1400
        Emeryville, California  94608
        Telephone: (415) 421-7100
        Facsimile: (415) 421-7105
        tschneider@schneiderwallace.com

        Todd S. Collins*
        Shanon J. Carson*
        Eric Lechtzin*
        Ellen T. Noteware*
        BERGER & MONTAGUE, P.C.
        1622 Locust Street

Philadelphia, PA 19103-6365
tcollins@bm.net
scarson@bm.net
enoteware@bm.net

*Attorneys for Plaintiffs*

*Pro Hac Vice application forthcoming